Case No. 23-1377

United States Court of Appeals

For the Tenth Circuit

JOANNE BLACK,
*Petitioner - Appellee,*

*v.*

BERNARD BLACK,
*Respondent - Appellant.*

**Motion for Leave to File Brief as *AMICI CURIAE*,**
**Families Against Court Embezzlement Unethical Standards**
**(F.A.C.E.U.S.)**
**IN SUPPORT OF APPELLANT**

Luanne Fleming, co-founder
Families Against Court Embezzlement Unethical Standards (F.A.C.E.U.S.)
18901 East Hawaii Dr.
Aurora, CO 80017
Phone:  (303) 204-1333 ,
Email:  faceusnow@hotmail.com

## MOTION FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE*

Families Against Court Embezzlement Unethical Standards (F.A.C.E.U.S.) seeks leave to file the accompanying brief as *amicus curiae*.

Proposed *amicus* is a nationwide disability rights and civil rights organization that advocates for rights of individuals who have been placed into guardianships or conservatorships, as well as more broadly for the people with disabilities, the elderly, and their families. Proposed *amicus* is engaged in public advocacy, legal reform efforts, collection of data, and provides help to victims of guardianship and conservatorship abuse nationwide. Proposed amicus has worked with numerous other public organizations dedicated to guardianship reform and related issues.

Proposed *amicus* runs a weekly radio show, F.A.C.E.U.S. RADIO, dedicated to the issues of guardianship and conservatorship abuse, trusts, and related matters.[1] The show hosts politicians, activists, authors, investigative journalists, attorneys, candidates for political offices, private investigators, and so on.

This brief falls outside the normal period where *amici* can submit their briefs (one week after the Appellant submitted his main brief). However, this Court has discretion to accept *amicus* briefs after this time. Proposed *amicus* believes that,

---

[1] The show airs every Wed at 8pm MST. Recorded episodes of the show can be heard at: https://www.blogtalkradio.com/hiddentruthrevealed/2024/05/30/faceus-radio-home-grabbing-without-recourse-under-the-color-of-law?fbclid=IwZXh0bgNhZW0CMTAAAR3T5V9nOW4PQIDfIHlo71NmdEN5as Grfv9VSt131WP7S077FlFrmOc6Ty4_aem_ZmFrZWR1bW15MTZieXRlcw

first, this brief will be critical for the Court in its decision-making; second, no party will suffer prejudice from the late filing; and third, *amicus* can be excused for not submitting its brief earlier because it was not realistically possible to do so, and *amicus* did not delay intentionally.

As to the timing: proposed *amicus* did not file the brief on time because *amicus* was not aware of this litigation. *Amicus* is a victims-rights organization unrelated to Appellant. Cases involving guardianships are notoriously difficult for victims' rights groups to follow. Guardianship cases involve sealed documents, and they grow out of court decisions that are sealed or restricted, as in the current case. While prospective *amici* in other cases have the luxury of monitoring filed complaints, *amici* in guardianship cases rely on luck and word of mouth. In the current case, there is an additional difficulty for victims-rights monitors: this case was filed in an unusual for the *amicus* forum (federal court), as an unusual for the *amicus* type of claim (removal). This combination – sealed state court documents plus an unusual case – made it impossible, as a practical matter, for *amicus* to learn about this case early enough to file a brief within the usual one-week-after-principal brief time frame.

Proposed amicus believes that no party will be adversely affected by the late filing. This case does not involve a true counterparty. Appellant is appealing a non-monetary sanction. Appellee manifestly has no interest in this sanction.

As to the purpose: Proposed *amicus* seeks to provide this Court with information about the consequences that this Court's decision will have for the guardianship- and disability-rights community, especially in Colorado, but also nationwide. It is crucial that this Court not penalize Appellant for trying to remove his case from the Denver Probate Court. As demonstrated in our brief, the Denver Probate Court is known, both in Colorado and nationally, for its failure to follow the law and for abuses perpetrated by its appointed guardians and conservators against their wards. The DPC's publicly-known actions, as detailed in our brief, are so far outside of the realm of normalcy that it bears emphasizing, **the Denver Probate Court is not a "normal" court.** The Colorado guardianship system, run by its probate courts, is not tolerable. Victims should be encouraged to escape this system as much as the law permits, including via removal, whenever removal is available. This is what Appellant sought to do. *Amicus* very much hopes that Appellant wins his appeal of sanctions for seeking removal. This will smooth the path to justice for other victims of the Denver Probate Court and other similar courts.

If this Court penalizes the victims of guardianship abuse who try to escape to a more trustworthy court, this will make escaping nearly impossible. Attorneys will not agree to help victims seek a victim-friendly forum because they will be afraid of being hit with sanctions. Victims' rights groups, including the proposed *amicus*, will be especially harmed, because they will not be able to find competent legal

representation in cases where the best advocacy involves seeking a change of forum.

In a recent public statement, proposed *amicus* wrote: "It is nearly impossible to find counsel to emancipate from a fraudulent adult guardianship. However, the most predatory professional guardians have a plethora of attorneys willing to defend them as the victimization grows unchecked."[2] Proposed *amicus* has interest in ensuring that this pattern ends.

*Amicus* did not seek consent of appellees because it is *amicus'* understanding that this case has no party with the standing to respond to this appeal. In any case, seeking consent would have been futile, because the supposed protectors of Joanne Black, her court-appointed counsel and conservator, have opposed *amicus'* effort to file an amicus brief in another case arising from the Black family effort to escape from an unwarranted Colorado conservatorship.   The Denver Probate Court is maintaining this conservatorship unlawfully: the ward, Joanne Black, has not lived in or set foot in Colorado for 11 years, and a state court of New York, where she lives, adjudicated her fully competent in 2016.

Proposed *amicus* seeks to explain to this Court the institutional details of conservatorships and guardianships maintained by the Denver Probate Court ("DPC"). These details are highly idiosyncratic. This information about the Denver

---

[2] https://www.facebook.com/amenontherun/posts/pfbid0uppkHKtV45psL38gm7D XbVkcwTeZ1CH23zQq6z2sm94tXnQ5N7o8pyrMVSaC8PAPl

Probate Court is critical for this Court's understanding why the Black family is justified in seeking removal, and indeed should have been permitted to remove its case from DPC.

Proposed *amicus* further seeks to present to this Court information about the systemic failures in the Colorado probate courts in running the guardianship system. These failures were so severe that the U.S. Department of Justice has recently filed a lawsuit against the state of Colorado in the District Court of Colorado, seeking to stop the abuse. These failures also caused several state audit investigations, all finding significant problems, which have not been remedied by the state. They also led to a serious legal reform efforts in recent years, seeking to curb the abuses perpetrated by Colorado probate courts and court personnel.

Proposed *amicus* also seeks to explain to this Court the typical pattern of an abusive conservatorship, and provide illustrative cases involving the Denver Probate Court. This will clarify why federal courts should be especially supportive of victims' efforts to remove when a legally removable case relates to a guardianship.

Proposed *amicus* is interested in this case as an important instance of a situation that is common but rarely visible to the public. Guardianship abuse is rampant, and it is critical to allow its victims to escape the state court system into the federal courts. When the escape is procedurally impossible, it is at least critical that the victims are not additionally penalized for trying to escape.

*Amicus* believes that this information is important and will assist this Court in ruling in favor of the appellant.

*Amicus* therefore seek leave to file their brief.

Respectfully submitted,

Families Against Court Embezzlement Unethical Standards
 (F.A.C.E.U.S.)
Luanne Fleming, co-founder
Robin Austin, co-founder

18901 East Hawaii Dr.,
Aurora, CO 80017
Phone:  (303) 204-1333
Email:   faceusnow@hotmail.com

August 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2024, a true and correct copy of the foregoing Motion to file Amicus Brief was served by upon the following, in the manner indicated below.

/s/ Luanne Fleming

Luanne Fleming, co-founder
Robin Austin, co-founder
Families Against Court Embezzlement Unethical Standards
 (F.A.C.E.U.S.)

    By U.S. mail

    *Appellee:*

    Lisa DiPonio, Esq.
    DiPonio & DiPonio
    7931 S. Broadway, #348
    Littleton, CO 80112

    *Pro Se Appellant:*

    Bernard Black
    2829 Sheridan Place
    Evanston, Illinois 60201

Case No. 23-1377

United States Court of Appeals
For the Tenth Circuit

JOANNE BLACK,

*Petitioner - Appellee,*

BERNARD BLACK,

*Respondent - Appellant.*

**BRIEF of *AMICI CURIAE*, Families Against Court
Embezzlement Unethical Standards
(F.A.C.E.U.S.) IN SUPPORT OF APPELLANT**

Luanne Fleming, co-founder
Families Against Court Embezzlement Unethical Standards (F.A.C.E.U.S.)
18901 East Hawaii Dr.
Aurora, CO 80017
Phone:  (303) 204-1333 ,
Email:   faceusnow@hotmail.com

i

## INTERESTS OF AMICI CURIAE

Proposed *amicus* is a nationwide disability rights and civil rights organization that advocates for the civil rights of individuals who have been placed into guardianships or conservatorships, beneficiaries of family trusts, as well as more broadly for the people with disabilities, the elderly, and their families. Proposed *amicus* is engaged in public advocacy, legal reform efforts, collection of data, and provides help to victims of guardianship and conservatorship abuse nationwide. Proposed *amicus* has worked with numerous public organizations dedicated to guardianship reform and related issues, such as the Center for Estate Administration Reform, Creative Living, and others.

Proposed *amicus* runs a weekly radio show, F.A.C.E.U.S. RADIO, dedicated to the issues of guardianship and conservatorship abuse and related matters.[1] The show hosts politicians, activists, authors, investigative journalists, attorneys, candidates for political offices, private investigators, and so on. Among the topics

---

[1] The show airs every Wed at 8pm MST. Recorded episodes of the show can be heard at:
https://www.blogtalkradio.com/hiddentruthrevealed/2024/05/30/faceus-radio-home-grabbing-without-recourse-under-the-color-of-law?fbclid=IwZXh0bgNhZW0CMTAAAR3T5V9nOW4PQIDfIHlo71NmdEN5as Grfv9VSt131WP7S077FlFrmOc6Ty4_aem_ZmFrZWR1bW15MTZieXRlcw

recently discussed in the show were: cases where probate and family courts facilitated siphoning of wards' assets to court personnel; cases where wards were made homeless due to misconduct of guardians; criminal investigation of a professional guardian for exploiting her wards; the role of judges in promulgating predatory abuse by court-appointed personnel and counsel; and interviews with individuals who succeeded at emancipating a family member from an abusive guardianship.

Proposed *amicus* has an interest in ensuring that every person has a right to obtain access to a fair and impartial judicial forum, especially in guardianship cases, where essential rights and liberties are at stake. When a state court that appointed a guardian is unwilling to end guardianship abuse, every victim should have a right to seek redress in federal courts, to the fullest extent permissible under the removal statute.

Proposed *amicus* further has an interest in ensuring that families and victims-rights organizations (such as the *amicus*) are not penalized for trying to help victims of guardianship abuse by removing their cases to federal courts. Every victim must feel free to exercise their statutory rights to removal without worrying about sanctions. Likewise, victim-rights organizations should not have to fear sanctions for assisting victims in exercising their removal rights.

Proposed amicus further has interest in holding guardians and other fiduciaries

responsible for the harm they cause to their wards. This responsibility will not happen if the victims cannot remove a case from state courts that condone the abuse.

In a recent public statement, proposed *amicus* wrote: "It is nearly impossible to find counsel to emancipate from a fraudulent adult guardianship. However, the most predatory professional guardians have a plethora of attorneys willing to defend them as the victimization grows unchecked."[2] Proposed amicus has interest in ensuring that this ends.

---

[2]https://www.facebook.com/amenontherun/posts/pfbid0uppkHKtV45psL38g m7DXbVkcwTeZ1CH23zQq6z2sm94tXnQ5N7o8pyrMVSaC8PAPl

# Contents

INTERESTS OF AMICI CURIAE.............................................................. ii

TABLE OF AUTHORITIES .....................................................................vi

BRIEF OF AMICUS CURIAE ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................1

ARGUMENT ...........................................................................................5

I.  The Denver Probate Court has been maintaining an unlawful conservatorship over Joanne Black. ...........................................................................5

II.  Institutional background: the systemic failures of the Denver Probate Court. ....8

    A. Summary: how the predatory conservatorship works. ...............................8

    B. The Jeansonne Case. ..................................................................9

    C. The Wells Case. .....................................................................12

    D. The Fleming Case. ..................................................................15

    E. The Cassidy Case. ..................................................................16

    F. The Fantin Case......................................................................17

    G. The Brannigan Case.................................................................18

III.  This Court should take a strong, public stand to support the victims of guardianship abuse and help them escape abuse-promoting state courts to federal courts whenever the removal statute allows. ............................................19

    A.  Several Colorado state audits found systemic failures in the guardianship/conservatorship system, administered by Colorado probate courts.........................................................................................19

    B.  Joanne Black's conservatorship is a typical example of a probate-court failure that was identified in the 2017 state audit.........................................22

IV.  This Court should revisit its decision not to allow the removal of all new claims recently brought before DPC to the federal court; at the very least, this Court should not punish Bernard Black for trying to remove the new claims, given twelve years of DPC's unlawful conduct in this case........................................................24

CONCLUSION.......................................................................................25

CERTIFICATE OF COMPLIANCE........................................................27

CERTIFICATE OF SERVICE ................................................................28

# TABLE OF AUTHORITIES

**Cases**

*In re Joanne Black*, Index 80253 (Sup.Ct., Richmond Cy.)......................................5

*In re Wells*, 2023CA784 (Colo.App.) .......................................................15

**Statutes**

C.R.S. §15-14.5-205 ........................................................................5

**Other Authorities**

2011 State Audit Report, Colorado Office of State Auditor, Judicial Branch ........21

2017 State Audit Report, Colorado Office of State Auditor, Judicial Branch ........22

Alan Prendergast, Homeless Millionaire Alan Fantin Wants His Day in Probate
   Court, *Westword* (Sept. 5, 2017) ...........................................................18

David Olinger, "Colorado Probate Courts Fail to Protect Those at Risk, Audit
   Finds", *The Denver Post* (Sept. 26, 2011) .......................................3, 21

David Olinger, Lawyers, others take sides of efficacy of Denver probate court,
   Denver Post, Oct. 25, 2010 ................................................................3, 10

Jennifer Kovaleski, Colorado guardianships can bleed estates with little to no
   oversight (May 17, 2021).....................................................................19

Jennifer Kovaleski, Colorado guardianships can bleed estates with little to no
   oversight, *Denver7 News* (May 17, 2021) ..............................................2

Jennifer Kovaleski, Former Denver court clerk blew whistle 10 years ago about

conservatorship system *Denver7 News* (Oct. 8, 2021)...................................12, 13

## BRIEF OF AMICUS CURIAE [3]

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court's decision in the current case will have significant effect on the guardianship- and disability-rights community, not only in Colorado, but also nationwide.

For many years, the Denver Probate Court has been maintaining an unlawful conservatorship over Joanne Black. Joanne is a lifelong New York resident with no ties to Colorado. In 2016, a New York supreme court adjudicated Joanne to be legally competent. This finding is binding on Colorado under federal and state constitutions, under the Colorado guardianship statute, and under Colorado Supreme Court precedent. The Denver Probate Court was required to dissolve Joanne Black's conservatorship at the very latest in 2016. But it did not.

Instead, DPC encouraged DPC-appointed court personnel to enrich themselves by flooding Joanne with their useless "services". DPC-appointed personnel hired dozens of other professionals, who generated endless billable hours. Together, these individuals generated millions of dollars of unpaid bills, charged

---

[3] No counsel for a party authored this brief in whole or in part. No party, party's counsel or any other person contributed any money to fund preparing the brief. The family of Joanne Black paid for copying and postage to mail the brief to the Court.

against Joanne. But they cannot get paid: Joanne's money is protected in her special-needs trust, the SNT.[4] Under the trust instrument and statutory rules governing special needs trust, the SNT assets cannot be used to pay to Joanne's personal creditors.

Ergo, the Denver Probate Court has now ordered to remove all assets from the protected SNT and transfer them to DPC-managed conservatorship.

If DPC succeeds in its effort to remove assets from Joanne's trust, all of Joanne's currently-protected money will be spent on DPC-appointed conservators and their team.

The Black family has been trying to stop this and preserve assets for Joanne in trust. One way to do so was by removing to federal court the new claims that DPC-appointed personnel recently brought before DPC. This Court should support the Blacks in their removal effort, not sanction Appellant for it.

DPC's misconduct is broadly known in Colorado, thanks to numerous investigative reports published by local journalists over the years.[5] A former clerk

---

[4] The formal name of this trust is the "Supplemental Needs Trust for the Benefit of Joanne Black."

[5] See, e.g., Jennifer Kovaleski, Colorado guardianships can bleed estates with little to no oversight, *Denver7 News* (May 17, 2021); David Olinger, "Colorado Probate Courts Fail to Protect Those at Risk, Audit Finds", *The Denver Post* (Sept. 26, 2011); David Olinger, Lawyers, others take sides of efficacy of Denver probate

of DPC has publicly spoken abot the court's misconduct, and insists that the misconduct continues today.[6] Three independent state audits inspected Colorado's probate courts (DPC being the main one) and found significant evidence of misconduct, consistent with the facts of the current case.[7] The US Department of Justice has recently filed a lawsuit in the District Court of Colorado, seeking to stop abuse of wards by guardianship personnel appointed by Colorado probate courts.[8]

DPC's publicly-known actions, as detailed in Part II of this brief, are so far outside of the realm of normalcy that it bears emphasizing, **the Denver Probate Court is not a "normal" court.** The Colorado guardianship system, run by its probate courts, is not tolerable. Victims should be encouraged to escape this system as much as the law permits, including via removal, whenever removal is available. This is what Appellant sought to do. Appellant should win his appeal of sanctions for seeking removal.  This will smooth the path to justice for other victims of the Denver Probate Court and other similar courts.

If this Court penalizes Appellant for trying to escape from guardianship abuse

---

court, *The Denver Post* (Oct. 25, 2010).

[6] See, e.g., Jennifer Kovaleski, Former Denver court clerk blew whistle 10 years ago about conservatorship system *Denver7 News* (Oct. 8, 2021).

[7] See, e.g., 2006 State Audit Report, 2011 State Audit Report, and 2017 State Audit Report, each from the Colorado Office of State Auditor, Judicial Branch.

[8] *U.S. v. Colorado*, Case *1:23-cv-02538.*

to a more trustworthy court, this will make escaping very hard for everyone. Attorneys will not agree to help victims seek a victim-friendly forum because they will be afraid of being hit with sanctions. Victims, their families, and victims' rights groups will not be able to find competent legal representation in cases where the best advocacy is a change of forum.

Federal courts should be a safe haven against state court misconduct, instead of piling on with their own sanctions. The removal statute exists exactly for the cases like this one. This Court should help the Black family exercise their removal rights. It should send a clear message: federal courts will not stand idly in the face of illegality and abuse.

## ARGUMENT

### I.    The Denver Probate Court has been maintaining an unlawful conservatorship over Joanne Black.

Joanne Black is a lifelong citizen and resident of New York. For a few months in 2012-13, she traveled to Colorado. In Colorado, she did not establish a household, but lived in short-stay motels. At that time, Joanne suffered a mental-health crisis, and the Denver Probate Court established a conservatorship over her. In 2013, Joanne returned to New York, where she has lived since. In New York, Joanne received extensive treatment. In 2016, Justice Aliotta of the New York Supreme Court, after a full evidentiary hearing, found Joanne to be legally competent and not in the need of a conservatorship or guardianship.[9]

Under the full faith and credit clause of the U.S. Constitution, the determination that a New York resident does not need a conservator, made by a New York court, is binding on all other courts. Likewise, the Colorado guardianship statute states that the determination of competency, made by the court of the ward's domicile, is binding on Colorado.[10] Under Colorado law, a determination that Joanne does not need a conservator immediately strips the Colorado courts of subject matter jurisdiction to take any actions with respect to the conservatee other than winding down the

---

[9] *In re Joanne Black,* Index 80253 (Sup.Ct., Richmond Cy.) (June 7, 2016).

[10] C.R.S. §15-14.5-205.

5

conservatorship.[11] The Denver Probate Court was required to promptly wind up and dissolve the conservatorship, but failed to do so.

Instead, the Denver Probate Court did the opposite: it initiated, or ordered Joanne's attorneys and conservators to initiate, multiple legal proceedings, in multiple states, and drove legal fees into the millions of dollars. This should have been a short-lived conservatorship, terminated in 2013 due to Joanne's permanent move to New York, or terminated in 2016 due to the binding adjudication that Joanne does not need a conservator. Instead, it has turned into a twelve-year money-making operation for DPC court personnel and attorneys. This conservatorship has generated millions of dollars in legal bills. Almost all of these bills were generated after Joanne was already adjudicated legally competent and not in need of a conservator, which means they were generated by a legally invalid conservatorship. As such, they are legally void.

For these millions in bills, conservators and attorneys have, to date, produced no value for Joanne. Worse, their litigation strategy has resulted in freezing of Joanne's multi-million-dollar special-needs trust, the SNT, from which she has now received no distributions since 2015.

This is where the role of the Denver Probate Court becomes critical. The exorbitant, self-serving bills of Joanne's conservatorship team are currently mostly

---

[11] *People ex rel. Smith v. Fremont Cnty. Ct.*, 106 Colo. 95 (1940).

unpaid. These individuals cannot be paid because Joanne's assets, currently over five million dollars, are held for her in her special needs trust. The SNT is a special statutory trust that is designed to protect the beneficiary's assets from claims by the beneficiary's personal creditors, such as attorneys, conservators, Medicaid, and so on.

The only way for DPC-appointed court personnel to be paid with Joanne's money is to remove the assets from the SNT. Thus, DPC ordered the conservatorship team to petition other courts, asking to remove all assets from the SNT and place them into DPC-overseen conservatorship. The team did petition several other courts to do so. **No other court has been willing to do this**. Therefore, recently, DPC ordered such removal itself.

Moving assets from the protected trust to the DPC-managed conservatorship is highly detrimental to Joanne. As long as the assets are in the SNT, they cannot be used to pay Joanne's creditors and can only be spent on Joanne's living, medical, and personal needs. As soon as the assets are moved from the SNT to the conservatorship, they are open to outstanding claims from multiple parties. Those claims, principally fees run up by DPC-appointed personnel and their team, and also claims from Medicaid accumulated over many years, are now in the millions of dollars and will wipe out much of Joanne's SNT.  The removed trust assets will also be managed by the same conservator who has run up millions of dollars in bills already, and will have free rein to continue to generate bills, until the remaining trust assets are exhausted.

Joanne's conservatorship team would not have been able to do any of this without the direct involvement and support by DPC. It is impossible to protect Joanne and her family without removing this case from DPC.

This Court should put an end to this abuse by permitting the Blacks to remove all new claims that DPC-appointed personnel recently brought, from DPC to the federal court. At the very least, this Court should not punish the Blacks for trying to remove.

## II.  Institutional background: the systemic failures of the Denver Probate Court.

### A. Summary: how the predatory conservatorship works.

A typical abusive conservatorship works as follows. A predatory attorney or guardian spots an elderly or otherwise vulnerable person with desirable assets. Often, these assets come from a sudden exogenous event, such as an insurance payout, settlement, inheritance, lottery winnings. It is this event of a sudden windfall that attracts predatory guardians/conservators, not anything about the health of the victim, which typically does not change when a predator starts seeking conservatorship.

The single strongest predictor of whether a predator will seek a needless guardianship/conservatorship is the wealth of the targeted victim. Guardians/conservators are not interested in establishing or maintaining a conservatorship over a destitute individual.

8

The predator then seeks to establish conservatorship, often deliberately giving the victim inadequate notice or misinforming the victim about the nature of the upcoming legal proceedings, to discourage or prevent the victim from retaining counsel.

Once the court establishes a conservatorship and grants the predator the control over it, the conservator transfers the victim's assets to him- or herself, her attorneys, and other associates through unnecessary or fictitious services, inflated hours, liquidation of the victim's assets through underpriced sales to parties related to the conservator, exorbitant prices for goods and services sold from related parties to the victim, etc. Even if the ward's condition dramatically improves, the conservator has no incentives to notify the court about the improvement and terminate the conservatorship, as long as the ward has any assets that the conservator can siphon away. If the family seeks to terminate the conservatorship, the conservator will fight to preserve it, as has happened to Joanne Black and the Black family.   Typically, such conservatorships quietly end as soon as the ward's money ends.

## B. The Jeansonne Case.

Take the heartbreaking case of Suzanne Jeansonne, another victim of the Denver Probate Court. In just five years, a conservator transferred more than $250,000 from Jeansonne's family trust to the conservator and her associates:

[Suzanne's] husband, Chris… was struck by a truck on an interstate 15 years ago. He survived, but "in a minimally conscious state" with a catastrophic brain injury… [Suzanne] provided 13 evaluations from doctors and hospitals in two states to show her husband was not neglected and is unable to recover from his injuries. Yet the [Denver Probate Court] judge appointed a guardian ad litem to investigate, who brought in a case manager, who hired a lawyer… Her husband is 46 now. His nursing-home care is covered by the federal government… He is tube-fed, unable to sit up or speak, "with no purposeful movement,"…Yet more than $9,000 a month [from his settlement] is being spent… for music, massage and physical therapists, private caregivers who sit with him and a guardian."[12]

This pattern of multiple court personnel hiring more and more people for no apparent purpose is typical for abusive conservatorships: supervision of staff generates billable hours and therefore fees for the court appointee who oversees the

---

[12] David Olinger, *Lawyers, others take sides of efficacy of Denver probate court*, Denver Post, Oct. 25, 2010, at https://www.denverpost.com/2010/10/25/lawyers-others-take-sides-of-efficacy-of-denver-probate-court/.

scheme. In the Jeansonne case, a guardian-ad-litem hired a case manager, who hired a lawyer, and all of them then hired assorted therapists and caregivers. It then becomes increasingly difficult for a family to fire any of these individuals, no matter how useless, because each firing will require multiple approvals, including approval from the court that approved the guardianship in the first place.

With the blessing from the Denver Probate Court, the money that was meant to last a critically ill person a lifetime was quickly drained by court personnel through exorbitant charges for needless services, such as music therapy for a functionally comatose patient (!!!). The family was helpless to stop the drain because the drain was fully supported by the Denver Probate Court. *Id.*

The former clerk of the Denver Probate Court, Caroline Cammack, who blew the whistle on the misconduct of the prior probate court judge, describes the currently ongoing abuse – now, by the current DPC judge – as follows:

> "It was the money that was lost —— and we're talking about millions of dollars in some estates," Cammack said. **"The real tragedy of it all is that they continue to do this."**… "These conservators, once they're appointed, it's really hard to get them removed," Cammack said. "The attorneys charge $300 an hour.[13]

---

[13] Jennifer Kovaleski, Former Denver court clerk blew whistle 10 years ago about conservatorship system *Denver7 News* (Oct. 8, 2021), at

(emphasis added)

## C. The Wells Case.

*(1) The predatory guardianship established by the Denver Probate Court*

Another victim of the Denver Probate Court is the Wells' family. The Denver Probate Court placed an elderly woman, Sharon Wells, under guardianship against the opposition of her grown sons. When the sons protested, the guardian falsely accused them of misconduct and obtained a restraining order. The Wells brothers successfully fought the restraining order, but they are still not permitted to see their mother. Isolating a conservatee from his or her family is a strong signal of fiduciary misconduct because doing so helps a predatory conservator loot the estate.

The guardian of Sharon Wells hired other personnel; together, they transferred Sharon's wealth to themselves via excessive fees and unnecessary services. When these professionals ran out of cash and could no longer pay themselves, the guardian and attorneys sold Sharon's houses at prices far below the market, and spent the proceeds on their own fees.

The Wells brothers suspect that these grossly underpriced sales of houses were done to related parties, constituting an actual theft of the conservatee's assets. When the Wellses protested and demanded investigations, the guardian used Sharon's

---

https://www.denver7.com/news/investigations/former-denver-court-clerk-blew-whistle-10-years-ago-about-conservatorship-system.

12

money to hire attorneys to fight against the family's efforts to stop the bleeding. This pattern – using the conservatee's own money to fight against the family's efforts to investigate misconduct of the conservator – is yet another sign of an abusive conservatorship. No matter how such fight ends, the family pays all outlays and loses. This is free fun for the conservator. At the worst, one gravy train ends; no other consequences, no return of transferred funds, no punishment.

During an 18-month period, records show the conservator charged nearly $150,000 to Sharon Wells, making up to $325 an hour for taking care of her estate.[14]

Worse yet, the guardian in the Wells' case petitioned the Denver Probate Court not to disclose to the family the guardianship financial reports. As a result, the family cannot monitor the potential looting and report it to the court or to the police.

This court-approved secrecy is common is cases of conservatorship abuse: a conservator or guardian obtains the probate court's permission not to share financial reports with the family and, under the cloak of secrecy, loots the estate.

Such secrecy also happened in the current case, the case of Joanne Black, which the Appellant was trying to remove. The Denver Probate Court refuses to

---

[14] Id.

share with the family information about the exorbitant billing by the unlawfully-maintained conservatorship.

*(2) The unlawful efforts of the Denver Probate Court to maintain its predatory guardianship/conservatorship of Wells.*

One important signal of a predatory conservatorship is a bizarre behavior by the probate court: not a mere error or disagreement, but an obvious willingness of the judge to violate the law to preserve the conservatorship.

Take the actions of the Denver Probate Court in the Wells' case. (This is the same judge whom the Blacks were trying to escape via removal).

Sharon Wells' twin sons, David and Greg Wells, hold a valid power of attorney from their mother, run their own business, are ready, able, and willing to arrange her care themselves – but have been unable to terminate the conservatorship. In December 2022, on the day of a critical hearing in the Denver Probate Court, the court building was closed due to a blizzard. The Wells brothers traveled to the courthouse anyway, just to be sure, and were denied entry. The Denver Probate Court claimed to have held a hearing at 3:00 p.m. on that day, ruled against the family's effort to terminate the conservatorship, and after the hearing somehow managed to write and issue a series of three orders, **dated the day of the blizzard,** when no hearings were held. No transcript exists for the supposed hearing. The Wells brothers were told by the court that something malfunctioned in the recording system

14

on that particular day, even though on other dates, recordings worked. The Wells brothers are now appealing the denial of due process, and questioning whether any actual hearing was held. *In re Wells*, 2023CA784 (Colo.App.).

As is typical, the Wellses have to pay their own legal fees (they are representing themselves, due to the lack of funds), while the conservator is using their family's money to maintain her own legal team in litigation against the family.

## D. The Fleming Case.

The Flemings are yet other victims of Colorado state courts, including the Denver Probate Court. Their case is eerily similar to the Blacks' case currently before this Court. The Flemings' mother had a trust established for her, which contained significant assets, including five real estate properties and 123 antique cars. As is typical, a predatory attorney convinced the family to establish a guardianship to deal with family disagreements related to the care of the mother. Once the courts became involved, one court-appointed personnel hired another, and the estate promptly ended up covered with numerous individuals, all of whom billed outrageous amounts, but provided nothing of value. The family had no power to stop this.

An important participant in the siphoning off the Flemings' assets was Jeannette Goodwin. This Jeannette Goodwin is Joanne Black's conservator in the current case. Goodwin established a very similar scheme with siphoning the assets

15

from the Flemings' trust. Jeannette Goodwin was also involved in numerous other scandalous guardianships (a few discussed in this brief).

The pattern of abuse is consistent: in the Fleming's case, as is in the Wells' case, the conservator and attorneys sold the wards' properties for a grossly low price (ten cents on the dollar in the Fleming's case). The buyers were opaque LLCs with unknown to the families' owners. In the Fleming case, only 13% from the sale went to the ward, while 55% of proceeds were promptly spent on attorneys and court personnel. The remainder was stored and, after the ward's death, distributed to the family, but not until the conservator took yet another cut of the money for herself.

As a condition for distributing the remaining funds to the family, the court personnel required the Flemings to sign waivers, giving up their rights to sue the conservator and her team for squandering their mother's estate.

As a result of this ten-year predatory guardianship, the Fleming family fortune, once many millions, was entirely dissipated – through suspicious underpriced sales of real estate to unknown LLCs, gross overbilling, and other undocumented losses. The probate court that should have stopped the abuse instead enabled it.

### E. The Cassidy Case.

In the case of Marie Cassidy, the Denver Probate Court ignored medical and legal powers of attorney that Marie had granted to her sons David and Robert, placed

Marie into an involuntary conservatorship, with Jeanette Goodwin as guardian. (The same Jeanette Goodwin who was involved in other cases discussed in this brief, and is Joanne Black's conservator in the current case).

Goodwin placed Marie into a poor quality nursing home and sharply limited family visits. The nursing home allowed her to literally starve to death – falling from 115 pounds when she entered to 82 pounds at her death 9 months later. Goodwin resisted all family efforts to move Marie to a better facility; the probate court did not intervene.

This case contains all typical features of an abusive guardianship: the isolation of the victim from her family, the abuse, the transfer of the victim's funds to the guardian, despite a pre-existing set of legally valid late-in-life care instructions.

**F. The Fantin Case.**

Alan Fantin is another victim of the Denver Probate Court and Jeannete Goodwin. Fantin suffered a major injury as a teenager, was physically disabled, and had in trust a multi-million dollar settlement from the accident. A series of conservators, including Goodwin, spent his trust assets on themselves, while leaving Fantin so short of funds he became literally homeless. Fantin's efforts before the Denver Probate Court to regain control of his own finances failed.

As Fantin explained to a *Westword* reporter in 2017, "I'm sitting on about three million dollars," he says. "But right now, I've got maybe two dollars in my

pocket. I've got no place to go." Instead, "I've got all these people using me as a meal ticket, bleeding me dry,"[15] Alan Fantin died a couple of years after this story came out. He was never able to enjoy the comfortable life that his trust should have allowed. The team of court appointees, established by the Denver Probate Court, profited handsomely.

## G. The Brannigan Case

Another victim of the Denver Probate Court is Pat Brannigan. He was an employed postal service worker and lived independently. After an injury, he received an $100,000 settlement. As is typical, the windfall attracted predatory guardians: against Brannigan's will, and despite his shown lifelong capacity for independent living and employment, the Denver Probate Court approved an involuntary conservatorship over him. The conservator spent all of the funds on herself and attorneys. Brannigan got nothing. The conservator resigned when the money was gone. "They just want my money[16]," Brannigan told a reporter.

*Amicus* could list thousands of cases with the same scenarios. Above are

---

[15] Alan Prendergast, Homeless Millionaire Alan Fantin Wants His Day in Probate Court, *Westword* (Sept. 5, 2017).

[16] Jennifer Kovaleski, Colorado guardianships can bleed estates with little to no oversight (May 17, 2021), at https://www.denver7.com/news/investigations/colorado-guardianships-can-bleed-estates-with-little-to-no-oversight.

simply some of the well-known Colorado cases.

**III.  This Court should take a strong, public stand to support the victims of guardianship abuse and help them escape abuse-promoting state courts to federal courts whenever the removal statute allows.**

**A.    Several Colorado state audits found systemic failures in the guardianship/conservatorship system, administered by Colorado probate courts.**

Colorado has been conducting periodic state audits of its guardianship systems: in 2006, 2011, and 2017. Every state audit came back showing significant problems: poor transparency, severe deficiencies in the appointment process and the selection of conservators, concealment of expenses by conservators, grossly inflated fees, and so on. The same problems travel from audit to audit, with no signs of fixing.

The 2011 state audit summarizes its findings as follows (emphasis added):

> **Overall, we found that the courts' processes do not ensure that the rights, welfare, and assets of wards are adequately protected** from the time the appointment of a guardian or conservator is sought until the appointment is terminated. With respect to the appointment process, we identified concerns with the information provided by the individuals nominated to be a guardian or conservator, the courts' appointment of attorney representation to the ward, and the appointment of court visitors and the information provided by court visitors. With respect to monitoring,

19

we identified concerns with the initial, annual, and final reports submitted by guardians and conservators; the courts' review of these reports; the courts' oversight of professional guardians and conservators; and the availability of data needed to monitor and track guardianship and conservatorship cases effectively. **Finally, we found that the Judicial Branch has not exercised appropriate governance over the courts to ensure that these cases are effectively managed statewide.**[17]

The Colorado Supreme Court responded to the 2011 report with promises to reform the probate courts. The Supreme Court Chief Justice, Michael Bender, who represented the judicial branch as the report was presented to Colorado's Legislative Audit Committee, told legislators he is "severely, substantially concerned" about the reported problems — and will make sure they are addressed. **"We understand the problem,"** he said, **"and we're going to make it a priority."** *Id.* (emphasis added).[18]

But the problem was not fixed. The subsequent, 2017, state audit found very

_____

[17] 2011 State Audit Report, Colorado Office of State Auditor, Judicial Branch. p.18.

[18] David Olinger, "Colorado Probate Courts Fail to Protect Those at Risk, Audit Finds", *The Denver Post* (Sept. 26, 2011). https://www.denverpost.com/2011/09/26/colorado-probate-courts-fail-to-protect-those-at-risk-audit-finds/.

similar problems.

> [W]e found that (1) there are significant gaps in the processes in place for the courts to ensure that Public Administrators only charge fees and costs that are reasonable and proper; (2) the Judicial Branch and the courts do not collect and maintain the fundamental data needed to oversee the Public Administrator function in Colorado; and (3) there are gaps in the bonding process, which is meant to protect the assets of protected persons in conservatorships and decedent estate cases.[19]

The 2017 (most recent) audit found that in whooping 41% of cases, conservators failed to "provide the courts with sufficient information to determine the reasonableness of fees and costs." Id. at 22. The audit found that in 56% of cases in large estates (which command the best and most competent attorneys), attorneys did not disclose sufficient information for the court to understand whether the fees are justified. Id.

Further, the 2017 audit found gross overbilling by Colorado conservators. The audit notes that, per good-practice guidelines from the American College of Trust and Estate Counsel, the proper range of conservators' fees is between 2 to 10 percent of the estate value. Larger estates command a smaller percent of the estate value in

---

[19] 2017 State Audit Report, Colorado Office of State Auditor, Judicial Branch, p.16.

fees because of the economies of scale. Nevertheless, most of the large estates were found to charge 9% (already per se excessive for a large estate), and in 30% of the reviewed cases, conservators charged grossly inflated fees, from 11% to astonishing 38% of estate value. *Id.*

The worst finding of the 2017 state audit was the connection between the secrecy and the excessive billing. The audit looked at 25 large estates (more than $6.7 million each) and found that those conservatorships that did not provide sufficient disclosure of expenses were also most likely to overbill. Among the conservatorships with insufficient disclosures, 57% charged grossly inflated fees above 11% of the estate value. *Id.*

## B. Joanne Black's conservatorship is a typical example of a probate-court failure that was identified in the 2017 state audit.

The current case contains every sign of a predatory conservatorship identified in these state audits.

Joanne's conservator, Jeanette Goodwin, has a long reputation of being involved in predatory conservatorships, as discussed above. It was Goodwin who syphoned away the assets in the cases of Fleming, Cassidy, and Fantin.

In the current case, Goodwin, with the support of the Denver Probate Court, has been refusing to disclose the conservatorship's expenses to the family. The family obtained copies of some of the legal bills that the conservator had amassed, and compared them to the annual report submitted to the Denver Probate Court. It

22

became clear that the conservator has been actively concealing even from the court the nature and details of her and her attorneys' expenses; with over $1.2 million in undisclosed fees as of the 2020 report. This makes it impossible for anyone – including the Denver Probate Court itself – to evaluate the reasonableness of the fees.

Finally, the conservatorship has charged Joanne in assorted fees many times more than any conceivable benefit from the conservatorship. The accumulated unpaid bills of the conservator and attorneys are in the millions. Joanne's annual income, outside her trust, is the payment from workers' compensation insurance and Social Security Disability Insurance, about $90,000 a year. The conservator takes a substantial part of this for herself and attorneys.

Joanne's conservator and attorneys have billed multiple millions of dollars to manage an annual income of $90,000, plus a trust that has its own trustees and does not permit any management from the conservator. This is far, far above anything that the 2017 State Audit defined as reasonable conservatorship expenses.

This behavior could only go on with (1) full cooperation from the Denver Probate Court, (2) misleading disclosures made to DPC, and (3) concealment of estate expenses from the family.

**IV. This Court should revisit its decision not to allow the removal of all new claims recently brought before DPC to the federal court; at the very least, this Court should not punish Bernard Black for trying to remove the new claims, given twelve years of DPC's unlawful conduct in this case.**

Joanne's conservator and attorneys, with the blessing from the Denver Probate Court, have been perpetrating a terrible abuse. They billed millions of dollars in fees, seeking to pay themselves by removing Joanne's assets from the protected trust. Joanne lives in New York, and pays her own rent and living expenses, from the portion of her monthly income that the conservator doles out.

Ongoing maintenance of this conservatorship violates Joanne's rights and the US and Colorado Constitutions. Joanne has a right to make her own decisions on whether spend money on litigation, whether to hire an attorney, and how to live her life. These rights have been taken from her by DPC and must be returned.

Colorado law provides a path toward terminating a no-longer warranted, or sometimes never-warranted, conservatorship.  Termination is mandatory unless a continued conservatorship is justified.  The case of Joanne Black's conservatorship is an unusually clean case: Joanne does not live in Colorado, has not lived in Colorado for over 10 years, and was found not to need a conservator in her home state, New York, over 8 years ago. The Denver Probate Court, by refusing to dissolve the conservatorship, is acting unlawfully.

While this Court cannot directly end Joanne's unlawful Colorado conservatorship, it should take significant steps to help end it indirectly. First, this

Court should allow the Black family to remove all newly-brought claims away from DPC. Then, it will become unprofitable for the predatory conservatorship team to maintain this conservatorship. Second, this Court should not punish the Black family for trying to escape DPC by removing.

If this Court punishes the family for trying to escape DPC, this will send waves through the guardianship world. It will hurt not only the victims of guardianship abuse and their families, but also organization such as the *Amicus*, that advocates for the vulnerable people nationwide. The victims of guardianship abuse are already in disadvantage, given the power that state courts have. Adding the penalty from the federal courts will make victim advocacy a lot harder. Reversing the sanctions imposed by the District Court will help us start fixing our broken guardianship/conservatorship system.

## CONCLUSION

*Amicus* respectfully urges this Court to reverse all punishments imposed on the Black family for trying to remove. Amicus also asks this Court to revisit its decision not to allow the removal of the new claims from DPC to the federal courts.


DATED: July 31, 2024

F.A.C.E.U.S.
Luanne Fleming (co-founder)
Robin Austin (co-founder)

By:

    /s/ Luanne Fleming

    LUANNE FLEMING
    18901 East Hawaii Dr., Aurora, CO 80017
    Phone: (303) 204-1333
    Email: faceusnow@hotmail.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with all requirements of Rules 29 and 32, including all formatting requirements set forth in these rules.

Specifically, the undersigned certifies that:

The brief complies with the applicable word limits set forth in Rule 29(d). The body of the brief contains 5,674 words, versus the limit of 6,500 words.

I acknowledge that my brief may be stricken if it fails to comply with any of the requirements of Rules 29 and 32.

By: /s/ Luanne Fleming

Luanne Fleming, co-founder
Families Against Court Embezzlement Unethical Standards

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August 2024, a true and correct copy of the foregoing Amicus Brief was served by upon the following, in the manner indicated below:

/s/ Luanne Fleming

Luanne Fleming, co-founder
    Robin Austin, co-founder

Families Against Court Embezzlement Unethical Standards
(F.A.C.E.U.S.)

    By U.S. mail

    *Appellee:*

    Lisa DiPonio, Esq.
    DiPonio & DiPonio
    7931 S. Broadway, #348
    Littleton, CO 80112

    *Pro Se Appellant:*

    Bernard Black
    2829 Sheridan Place
    Evanston, Illinois 60201